**Ernest GRAFF, Appellant,**

v.

**Martin M. MALAWER, M.D. and Children's Hospital National Medical Center, Appellees.**

**No. 90–454.**

District of Columbia Court of Appeals.

Argued Feb. 4, 1991.
Decided June 11, 1991.

Michael S. Rosier, for appellant.

Austin F. Canfield, Jr. for appellee.

Before FERREN and FARRELL, Associate Judges and BELSON, Associate Judge, Retired.*

BELSON, Associate Judge, Retired:

Appellant Ernest Graff appeals the trial court's entry of summary judgment in favor of appellees, Martin M. Malawer, M.D., and the Children's Hospital National Medical Center.[1]  Graff's principal contentions

---

\* Judge Belson was an Associate Judge of the court at the time of argument.  He became an *Associate Judge, Retired,* effective June 1, 1991.

1.  Graff also sued Max Cohen, M.D., Willie Thompson, M.D., Timothy Garvey, M.D., and The Washington Hospital Center Corporation.

Graff subsequently dismissed his suit against the named individuals and he does not contest the granting of summary judgment in favor of the Washington Hospital Center Corporation.

are that a hemipelvectomy (leg amputation) was performed on him without his informed consent and that the record evidence shows material issues of fact regarding the issue of informed consent. We affirm.

## I.

On September 12, 1985, Graff, a fifty-eight year-old male, consulted George P. Bogumill, M.D., an orthopedic surgeon at Georgetown University Hospital, regarding a painful mass in his left groin. Dr. Bogumill examined Graff and diagnosed chondrosarcoma of the left pubic area, a cancerous condition. Dr. Bogumill recommended resection, advised Graff that he could possibly have both legs amputated, and referred him to Martin M. Malawer, M.D., an expert in hemipelvectomies, for consultation related to surgery. On October 15, 1985, Graff consulted with Dr. Malawer and Dr. Willie Thompson, who then served as a fellow under Dr. Malawer in Orthopedic Surgical Oncology, at Dr. Malawer's office in the Children's Hospital National Medical Center. Following a thorough examination and various studies of the lesions, it was determined that Graff suffered from multiple hereditary osteochondromas which had a twenty percent chance of malignant degeneration during his lifetime.

Dr. Malawer planned to perform a surgical procedure on Graff's left pelvis in an effort to save his leg, but with the possibility of a hemipelvectomy, and discussed with Graff the proposed surgical procedures. At that time, Graff appeared to Dr. Malawer to understand the need for the performance of the extensive surgery.

On October 30, 1985, Graff was admitted to the Washington Hospital Center. Graff was driven to the Washington Hospital Center by his brother Ronald A. Graff. During the drive, they discussed the procedures that would be performed and the

possibility that Graff might have his leg amputated, although they referred to this as something that might occur at a future time. This conversation was memorialized in writing by Ronald Graff in a letter dated July 3, 1987, addressed to Dr. Malawer.

At 9:30 p.m. that evening, Graff signed an Operative Consent Form and two disposal forms authorizing the disposition of body parts after surgery.[2] He was not under medication at that time and did not receive any medication until 10:00 p.m. The following day, October 31, 1985, he underwent surgery. Through a frozen section biopsy of the lesions during surgery, Dr. Malawer discovered that the tumors were a high-grade chondrosarcoma. Dr. Malawer concluded that a safe limb-sparing procedure could not be performed and that he would have to proceed with the hemipelvectomy. He conversed with Dr. Cohen, a general surgeon, about the size of the tumor and its proximity to the bowel and bladder. He concluded that the tumor was unresectable and the hemipelvectomy was performed.

During Graff's post-operative hospital care he never complained about the amputation of his leg. Moreover, although Graff did complain to Dr. Thompson that one of his testicles was removed, Graff stated that he knew his leg would be amputated but not that he would be castrated. Dr. Thompson explained to Graff that he had not been castrated and that any appearance that he had been was the result of swelling from the surgery. Although Graff complained on numerous occasions to the nurses of phantom leg pains, he never complained that he had not consented to the amputation of his leg. In fact, the record demonstrates that Graff's first complaint that his leg had been removed without his consent occurred approximately one and one-half years following his surgery and was made to Dr. Malawer. Graff never complained to Dr. Bogumill about his leg having been amputated without his consent

---

**2.** The original disposal forms are not in the record on appeal. Counsel for appellees stated at oral argument that it is the regular practice to transfer the forms to the funeral parlor with the amputated leg. Appellees submitted a blank disposal form of the type used as part of the record on appeal, and affidavits of two nurses who performed a pre-operative check of Graff's file verified that he had signed the two disposal forms prior to surgery.

**1040**

until May 4, 1988, nearly two and one-half years after appellant's surgery.

Graff filed a complaint alleging negligence, medical malpractice, lack of informed consent, and intentional tort arising from the amputation of his left leg. The trial court dismissed Graff's intentional tort claim. Because Graff did not identify any expert witnesses and *res ipsa loquitur* did not apply, the only issue of negligence that remained was the one presented on this appeal, whether appellees negligently failed to obtain Graff's informed consent. Appellees filed a motion for summary judgment and contended that in light of the evidence, there was no genuine issue of material fact for submission to a jury. The trial court granted appellees' motion and ruled that there was no genuine issue as to any material fact bearing upon the crucial question of whether Graff had consented to surgery with the knowledge that it might include amputation of a leg.

## II.

Graff contends that the hemipelvectomy was performed without his informed consent because he was unaware prior to surgery that if the surgical effort to spare his limb should prove unsuccessful, the hemipelvectomy would be performed during the same operation. He further argues that it was not he who made the decision to amputate the leg, pointing out the deposition testimony of Dr. Martin Malawer who stated that ultimately it was he, Dr. Malawer, who decided during surgery that it was necessary to amputate Graff's leg. Finally, Graff's appellate counsel asserted during oral argument that Graff's deposition contained statements denying his consent to an operation involving the amputation of his leg.[3]

■ Summary judgment is appropriate only "when there are no material facts in issue and when it is clear that the moving party is entitled to judgment as a matter of law." *Spellman v. American Sec. Bank, N.A.,* 504 A.2d 1119, 1122 (D.C.1986); Su-

per.Ct.Civ.R. 56(c). The moving party must demonstrate the absence of any genuine issue as to material facts. *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 198 (D.C.1991); *accord, Turner v. American Motors Gen. Corp.,* 392 A.2d 1005, 1006 (D.C.1978). If it makes that showing "by pointing out that there is a lack of evidence to support the plaintiff's case," it is incumbent upon the non-moving party to show that such an issue exists. *Beard,* 587 A.2d at 198. The burden on the non-moving party is "that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Nader v. de Toledano,* 408 A.2d 31, 48 (D.C.1979) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); *accord, Hill v. White,* 589 A.2d 918, 920–21 (D.C.1991). Conclusory allegations made by the plaintiff are not sufficient to defeat the entry of summary judgment. *Beard,* 587 A.2d at 198.

■ This court must conduct an independent review of the record when reviewing a trial court's order granting summary judgment. *District of Columbia v. Pierce Assoc.,* 527 A.2d 306, 312 (D.C.1987); *Holland v. Hannan,* 456 A.2d 807, 814 (D.C.1983). In so doing, we determine whether any relevant factual issues exist by examining and taking into account the pleadings, depositions, and admissions along with any affidavits on file, *McCoy v. Quadrangle Dev. Corp.,* 470 A.2d 1256, 1259 (D.C.1983); *Turner, supra,* 392 A.2d at 1006, construing such material in the light most favorable to the party opposing the motion. *Spellman, supra,* 504 A.2d at 1122.

Because Superior Court Civil Rule 56 is identical to Federal Rule Civil Procedure 56, "we may look to federal court decisions interpreting the federal rule as 'persuasive authority in interpreting [the local rule].' "

---

**3.** The parties agreed, during oral argument, that the record on appeal be supplemented with appellant's deposition.

*Cohen v. Owens & Co.*, 464 A.2d 904, 906 n. 3 (D.C.1983) (citing *Vale Properties, Ltd. v. Canterbury Tales, Inc.*, 431 A.2d 11, 13 n. 3 (D.C.1981) (citations omitted)). The Supreme Court has held that when a judge reviews a summary judgment motion,

> [he] must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (citation omitted and emphasis in original); *accord, Beard, supra,* 587 A.2d at 199.

■ Employing this standard here, we are satisfied from our review of the record that Graff did not raise a genuine issue of fact concerning his lack of informed consent to the leg amputation. We are aware Graff stated in his deposition that it was his understanding he was being admitted to the hospital for chemotherapy, not for surgery, and stated that he never consented to having his leg amputated. Graff also stated that he neither remembered discussing the consent form and body parts disposal form nor recalled signing them, and stated further that he had no discussion with Dr. Malawer regarding amputation. Nonetheless, because the testimonial and documentary evidence in the record, particularly the consent form that bore what he admitted was his signature, is so overwhelmingly contrary to Graff's position, we, like the trial judge, are persuaded that a reasonable jury could not find by a pre-

ponderance of the evidence that Graff is entitled to prevail.

The record contains an operative consent form indisputably signed by Graff consenting to the performance of a left pelvic resection and possible hemipelvectomy. It also contains an affidavit by nurse Taija Townsend that Graff signed the consent form when she presented it to him and that he was not under any medication when doing so, as well as an affidavit by nurse Carol Maddox that Graff's medical records prior to surgery contained the signed operative consent form and two signed disposal of body part forms.

Other evidence of appellant's informed consent includes (1) the affidavit of Dr. Thompson who stated that Graff's condition and all surgical procedures were explained to him prior to surgery; (2) Dr. Malawer's notes on Children's Hospital stationery outlining the plan for Graff's surgery that an effort would be made to spare the limb with the understanding that a hemipelvectomy could be performed, depending on the nature of the tumors, a matter which could be determined only during the operation; and (3) Dr. Bogumill's affidavit stating that he had advised Graff he could possibly lose both legs due to his hereditary disease.

We also find it significant, and Graff does not dispute, that his medical records from the Children's Hospital National Medical Center establish that while he was in the hospital following surgery, he never complained that his leg had been removed without his consent. According to Dr. Thompson, Graff acknowledged to Dr. Thompson after surgery that Graff had known about the amputation, but had not known about another effect of the operation which he thought (mistakenly) had come about. Our review of the remaining documents consisting of Dr. Malawer's deposition and the affidavit of Lena Jacobs, Sr. L.P.N., also supports the trial court's conclusion.

Finally, we find ourselves unable to agree with Graff's argument that Dr. Malawer's deposition testimony that he made the ultimate decision to perform the hemi-

pelvectomy demonstrates that Graff did not consent to that surgical procedure. To the contrary, Dr. Malawer's deposition testimony merely shows that he, rather than Dr. Cohen, made the ultimate decision during surgery whether it was safe to perform the hemipelvectomy, and consulted Dr. Cohen only because of the tumor's size and location relative to Graff's bladder and bowel.

In sum, the factual material before the court established overwhelmingly that prior to surgery Graff had an understanding of and consented to the surgical procedure that was performed, knowing that it possibly entailed a possible hemipelvectomy. He has not identified any dispute as to material facts sufficient to present a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson, supra,* 477 U.S. at 248, 106 S.Ct. at 2510.

Accordingly, the trial court's decision is *Affirmed.*