Katherine T. WALLACE,
Ph.D., Appellant,

v.

ECKERT, SEAMANS, CHERIN &
MELLOTT, LLC, Appellees.

No. 10–CV–978.

District of Columbia Court of Appeals.

Argued April 19, 2011.
Decided Nov. 15, 2012.

Katherine T. Wallace, pro se.

John T. May, with whom Dwight D. Murray, Washington, DC, was on the brief, for appellees.

Before WASHINGTON, Chief Judge, and WAGNER and REID, Senior Judges.*

WAGNER, Senior Judge:

Appellant, Katherine T. Wallace, Ph.D., appeals from the grant of summary judgment in favor of her former employer, appellees Eckert, Seamans, Cherin & Mellott, LLC ("Eckert Seamans," "employer" or "firm"), on her complaint for wrongful discharge. In her complaint, appellant alleged that Eckert Seamans wrongfully discharged her: (1) because of her refusal to violate the law and Rule 1.1 of the District of Columbia Rules of Professional Conduct; (2) in breach of express and implied promises of employment; and (3) for unlawful discriminatory reasons based on race, age, disability and gender. The trial court concluded that no genuine issues of material facts were in dispute and that Eckert Seamans was entitled to judgment as a matter of law. In addition to seeking reversal of summary judgment, Dr. Wallace challenges on appeal the trial court's order declining to compel production of certain documents withheld by Eckert Seamans on the grounds of attorney-client and work product privileges. We affirm the trial court's decision.

* Judge Reid was an Associate Judge, Retired, at the time of argument. Her status changed to Senior Judge on December 12, 2011.

## I.

The facts underlying this case may be summarized briefly as follows. On July 30, 2007, Eckert Seamans hired Dr. Wallace, an African–American, as a project attorney to work in its Washington, D.C. office reviewing and translating documents written in German and other foreign languages related to litigation involving one of its clients.[1] Her responsibilities included coding these documents using a computer system in order to categorize them for purposes of identification and document production in certain products liability cases. About one year after she was hired, Eckert Seamans terminated Dr. Wallace's employment, asserting that her productivity level was unacceptably low when compared to that of other attorneys performing coding work on the project. Eckert Seamans offered Dr. Wallace an opportunity to retain her position provided she made a commitment to improve her productivity level consistent with that of her peers. She declined the offer, contending that the employer's demand would require her to violate ethical standards of the profession and the law. Dr. Wallace filed a complaint in Superior Court alleging claims for: (1) wrongful termination for refusal to violate D.C.Code §§ 22–3211 and –3221; (2) wrongful termination for refusal to violate Rule 1.1 of the District of Columbia Rules of Professional Conduct; (3) promissory estoppel; and (4) racial, disability, age, and sex discrimination in violation of D.C.Code § 2–1402.11(a). After discovery, Eckert Seamans moved for, and was granted summary judgment, and this appeal followed. Additional facts are set forth with the analysis of the arguments to which they relate.

## II. Wrongful Discharge Claims

Dr. Wallace argues that the trial court erred in granting Eckert Seamans summary judgment on her claim that she was wrongfully discharged in violation of public policy for her refusal to violate the law, D.C.Code §§ 22–3222 (theft) and –3221 (fraud), and Rule 1.1 of the District of Columbia Rules of Professional Conduct. She contends that she presented evidence showing a jury triable issue concerning whether Eckert Seamans fired her solely for the improper reasons she asserts. Eckert Seamans argues that Dr. Wallace failed to provide evidence supportive of her claim that her employment required her to violate the law or the Rules of Professional Conduct. It also challenges the legal viability of her public policy argument based on the Rules of Professional Conduct. We set forth briefly the legal principles related to Wallace's wrongful discharge claims before addressing them.

### A. Applicable Legal Principles

"It has long been settled in the District of Columbia that an employer may discharge an at-will employee at any time for any reason, or for no reason at all." *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C.1991) (citations omitted). In *Adams*, this court recognized "a very narrow exception to the at-will doctrine under which a discharged at-will employee may sue his or her former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal

---

1. Dr. Wallace related in her declaration filed in the trial court that she graduated *cum laude* from Georgetown University Law Center and that she holds "Bachelors and Masters degrees from Stanford University in French and German Literature and Languages, and German Studies, respectively." She also holds a Masters and Ph.D. degrees from Harvard University in Comparative Literature (German, French and Spanish–American). She is fluent in German, French and Spanish with reading and research fluency in Latin, Portuguese and Italian.

to violate the law, as expressed in a statute or municipal regulation." *Id.* at 34. In *Adams,* the former employee, a truck driver, alleged that his former employer fired him solely for his refusal to drive a truck that did not have an inspection sticker as required by a municipal regulation. *Id.* at 34. Subsequently, a majority of the en banc held that *Adams* does not preclude the recognition of other public policy exceptions to the at-will employment doctrine when warranted by the circumstances. *Carl v. Children's Hosp.,* 702 A.2d 159, 160 (D.C.1997) (en banc). In *Carl,* a majority explained that "the recognition of any public policy exceptions to the at-will doctrine must be solidly based on a statute or regulation that reflects the particular public policy to be applied, or (if appropriate) on a constitutional provision concretely applicable to the defendant's conduct." *Id.* at 163. The public policy exception upheld in *Carl* was based on a statute, D.C.Code § 1–224 (1992).[2] *See id.,* 702 A.2d at 163–64 & n. 6 (Terry, J., concurring).

This court has not decided whether the Rules of Professional Conduct, upon which Dr. Wallace relies, are the equivalent of a statute or regulation for the purpose of application of a public policy exception to the at-will employment doctrine. *See Wallace v. Skadden, Arps, Slate, Meagher & Flom (Skadden, Arps),* 715 A.2d 873, 883–84 (D.C.1998). Although the theory was advanced in *Skadden, Arps,* this court concluded that the appellant's claim failed because her complaint revealed that "she was not terminated solely, or even substantially, for engaging in conduct protected by such an exception." *Id.* at 886. The court also observed that the particular Rules of Professional Conduct upon which appellant relied in that case had no applicability to her claim.[3] *Id.* at 883–84.

## B. Analysis

■ Dr. Wallace's position in the trial court and on appeal is that in order to meet the employer's new productivity goals for the review of German language documents, she would have to perform the work incompletely with the employer's apparent expectation that she would bill the client for full performance. Therefore, she contends that the employer's productivity requirements were tantamount to instructing her to violate two criminal statutes, D.C.Code §§ 22–3222 (theft) and –3221 (fraud), and Rule 1.1 of the District of Columbia Rules of Professional Conduct.[4]

**2.** In *Carl, supra,* plaintiff, a nurse, alleged that her employer, Children's Hospital, had discharged her for advocating for patients' rights in testimony before the Council of the District of Columbia in opposition to tort reform. 702 A.2d at 160. She contended that her discharge was contrary to public policy as expressed in D.C.Code § 1–224 (1992), which makes it a crime to intimidate or impede any witness in any proceeding before the Council. A majority of the en banc court held that her complaint for wrongful discharge stated a claim upon which relief could be granted. *Id.* at 161.

**3.** In *Skadden, Arps,* a junior associate in a law firm alleged that she was discharged for reporting improprieties of other attorneys to her supervisors. *Skadden, Arps, supra,* 715 A.2d

at 882. She contended that she was required to do so by Rule 5.1 (Responsibilities of a partner or supervisory lawyer) and Rule 5.2 (Responsibilities of a subordinate lawyer for compliance with the rules even if a supervising attorney directs otherwise, except for limited exceptions). *Id.* at 883. Noting that neither rule imposed a duty upon a subordinate attorney to report anything to her superiors, this court held that the discharged employee could not sustain the complaint on the basis of these rules under *Adams. Id.* at 884.

**4.** D.C. Bar Rule X, § 1.1 provides, in pertinent part:

(a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill,

Based on these theories, Dr. Wallace claimed that Eckert Seamans violated public policy in firing her for her refusal make a commitment to comply with its productivity standards.

In granting summary judgment for Eckert Seamans, the trial court found that Wallace had failed to produce any evidence supporting her claim that her employer's sole reason for firing her was her refusal to violate the law. Assuming without deciding that a public policy exception could be based on the Rules of Professional Conduct, the trial court granted summary judgment for Eckert Seamans on this theory because Dr. Wallace failed to produce evidence showing that her employer's instructions for document review required her to violate Rule 1.1. The trial court concluded that Wallace relied upon conclusory allegations and speculation for her argument, which are insufficient to defeat a properly supported motion for summary judgement.

■ Summary judgment will be granted if a party demonstrates that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Super. Ct. Civ. R. 56(c); *see Murphy v. Schwankhaus*, 924 A.2d 988, 991 (D.C.2007) (setting forth summary judgment standard under Super. Ct. Civ. R. 56(c)). Once the moving party makes the requisite initial showing, "the burden shifts to the non-moving party to come forward with specific evidence showing, to the contrary, that genuine issues of material fact do exist." *Id.* (citing *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d

195, 198–99 (D.C.1991)). We agree with the trial court that Dr. Wallace failed to meet this burden after Eckert Seamans had made the requisite initial showing.

In support of its motion for summary judgment, Eckert Seamans provided numerous affidavits and portions of Dr. Wallace's deposition testimony supporting its claim that the firm terminated her employment because of her unacceptably low rate of productivity and her refusal to commit to improving it. According to the undisputed evidence, Dr. Wallace was one of a number of lawyers hired by Eckert Seamans to review and code foreign language documents for discovery purposes in certain products liability cases involving one of its clients. These attorney document reviewers performed the work through databases accessible by computers that recorded productivity and coding of each document reviewer while logged on. In about November 2007 and again in June 2008, team leaders informed all attorney document reviewers that the pace of review had to be increased. Over a 2½ month period, the entire group of foreign language document attorneys reviewed on average 8.5 documents per hour with some averaging 12 documents per hour. During the same period, Dr. Wallace reviewed an average of 5 documents per hour. Although the firm set a new review goal of 15 to 20 documents per hour, attorney document reviewers were informed that this was not intended to be a quota, and they were never told to sacrifice the quality of their work. Dr. Wallace testified at a deposition that she understood that this new hourly review target was a goal and that no one in the firm told her specifically that she should increase her pace of review

---

thoroughness, and preparation reasonably necessary for the representation.
(b) A lawyer shall serve a client with skill and care commensurate with that generally

afforded to clients by other lawyers in similar matters.

if it meant performing substandard work. She also testified that she understood that an e-mail dated June 19, 2008 stating that the German language reviewers were still too slow to mean that they had to improve the productivity rate. Initially, Dr. Wallace increased her productivity, tried to be more brief in reviewing unimportant documents and writing explanations for documents. Dr. Wallace also testified that she never did substandard work, and she had no knowledge of whether other document reviewers were performing substandard work.

After reviewing productivity reports, two members of the firm decided to terminate the two foreign language attorneys with the lowest productivity rates, namely, Dr. Wallace and Mr. H. Wilfert. Dr. Wallace requested reconsideration, and Eckert Seamans agreed to rescind the firing decision provided she made a commitment to maintain a higher level of productivity. However, on July 13, 2008, Dr. Wallace informed her employer that she was unwilling to comply with the conditions in an e-mail to a member of the firm, Timothy Coon.[5] Eckert Seamans made the same offer to the other attorney slated for termination for low productivity, and he agreed to the condition and was retained.

In her opposition to the motion for summary judgment, Dr. Wallace did not refute these salient facts. Principally, through her own declaration, she sought to show: (1) that the work of the foreign language attorneys is complex and varied depending upon the length and nature of the documents; (2) that the project managers for Eckert Seamans should have known that compliance with the new productivity goal would require the reviewers to compromise the quality and completeness of their work in violation of the law and Rules of Professional Conduct; and (3) that the firm's productivity measures are meaningless and arbitrary in that productivity cannot be measured by counting documents reviewed over a given period of time. Dr. Wallace offered no admissible evidence that compliance with the employer's productivity goals had caused or would require foreign language document reviewers to violate the law or the Rules of Professional Conduct. Although she claimed that several project attorneys expressed the view that meeting the document review goals would require shortcuts, Dr. Wallace provided no affidavits or deposition testimony from these unidentified individuals or from Thomas Miller, the one person she identified as having said that he would have to shortchange the client in order to comply. Under Super. Ct. Civ. R. 56(e), a party opposing summary judgment must " 'set forth by affidavit or in similar

---

5. Dr. Wallace sent copies of the e-mail to others in the firm, including Richard Dandrea, a firm member, Brian Calla, a special contract associate, and R. Ricci. In her e-mail, Dr. Wallace explained her position, in pertinent part, as follows:

Since neither you or anyone at your end is competent to evaluate my job performance because I work in German, French, Spanish, Italian and Portuguese, any performance standards or expectations you set for me will be based in absolute ignorance. Indeed, since you are inherently incompetent to evaluate the substance of my work, it follows that you are likewise completely

incapable of determining what an appropriate pace or productivity level is for that work.... Consequently, committing to meet such expectations would put me at odds with my duty to my client ... under Rule 1.1 of the District of Columbia Rules of Professional Conduct....

If your offer of continued employment is contingent on me making such a commitment, I will be forced to reject it and file a lawsuit against Eckert Seamans for wrongful discharge under the public policy exception to the at-will doctrine, among other causes.

sworn fashion specific facts showing that there is a genuine issue for trial.'" *Potts v. District of Columbia,* 697 A.2d 1249, 1251 (D.C.1997) (citation and internal quotation marks omitted). The opposing affidavit must be made on personal knowledge and set forth facts admissible at trial that show that the affiant is competent to testify about the matters stated in it. *Id.* (quoting Super. Ct. Civ. R. 56(e)). Dr. Wallace's hearsay declarations as to what others said about the potential impact on their work of compliance with the new productivity standards is inadmissible hearsay, which is insufficient to meet the requirement of Rule 56(e). *See id.; see also Jones v. United States,* 17 A.3d 628, 632 (D.C.2011) (explaining generally the inadmissibility of hearsay, *i.e.,* "an out-of-court assertion of fact offered into evidence to prove the truth of the matter asserted.") (citations omitted).

■ Dr. Wallace relies on her own declaration for admissible evidence supporting her claim that disputed issues of material fact remain for trial. Specifically, she refers to her assertions concerning the nature and complexity of the work, the variation in the length of documents and time required for review and her conclusion that any commitment to try to improve her pace of review would require her to breach her ethical responsibility and ultimately the law. Dr. Wallace contends that a reasonable jury could find from this evidence that her employer's instructions for an increased pace of review necessarily implied an instruction to ignore her professional responsibilities. There are several flaws in this argument. First, Dr. Wallace's statement that the employer's request for increased productivity was tantamount to an instruction that she violate the Rules of Professional Responsibility and the law are conclusory assertions. Mere conclusory allegations in response to

a properly supported motion are insufficient to avoid summary judgment. *Musa v. Continental Ins. Co.,* 644 A.2d 999, 1002 (D.C.1994) (citing *Graff v. Malawer,* 592 A.2d 1038, 1040 (D.C.1991)). Dr. Wallace offered no evidence, by affidavit, depositions or otherwise, that the firm's more productive employees, as determined by the same standard applied to Wallace, or those who continued to work under its new productivity goals were instructed or compelled to violate the law or the Rules of Professional Responsibility. Although Dr. Wallace states that she informed project managers that accelerating the pace of the work would require less thorough review, significantly she failed to offer admissible evidence that any other workers experienced similar difficulties. As the trial court concluded, Dr. Wallace failed to provide more than conclusory statements that project managers knew or should have known that the productivity goals were impossible to meet or that meeting them would or did result in defrauding, stealing or cheating the firm's client. All of the evidence cited by Eckert Seamans is to the contrary. Second, contrary to Dr. Wallace's argument, the critical omissions in the evidence required to prove her wrongful discharge claims can not be established by inferences from the evidence offered. "While the jury may draw reasonable inferences from the evidence, it may not base its verdict on guess or speculation." *Gebremdhin v. Avis Rent–A–Car Sys.,* 689 A.2d 1202, 1204 (D.C.1997) (citing *District of Columbia v. Billingsley,* 667 A.2d 837, 842 (D.C.1995) and *Johns v. Cottom,* 284 A.2d 50, 53 (D.C.1971)) (other citation omitted); *see also* STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2–3 (ed. rev.2002) (permitting jurors to draw inferences or conclusions from the evidence that reason and common sense lead them to make). There is no evidence from which a lay juror could

infer reasonably that Wallace's employer knew or should have known that the only way foreign language attorneys could perform their work under its new productivity goals was by violating ethical standards and the law. Dr. Wallace offered no expert opinion as to the standard required for review of foreign language documents for discovery purposes in the litigation involved or how the employer's instructions for review failed to comport with the Rules of Professional Conduct.[6] She denied performing substandard work, although she increased productivity. She failed to provide admissible evidence that others performed substandard work. Third, Dr. Wallace admits to the material facts that defeat her wrongful discharge claims. She concedes that she was offered an opportunity to continue her employment under the same standard applied to the firm's other foreign language attorneys and that she refused to do so. The evidence Dr. Wallace offered failed to support her claim that Eckert Seamans fired her for any reason in violation of public policy.[7]

■ Dr. Wallace argues for the first time on appeal that the trial court erred in granting Eckert Seamans' summary judgment motion on the wrongful discharge claims because the supporting affidavits of the project managers referred to logs, data and reports. She contends that the affiants' reliance upon these documents to determine productivity levels violates the best evidence rule and Super. Ct. Civ. R. 56. This rule provides that "[w]here the contents of a writing … may be at issue, the best evidence of the writing is the document itself." *Fox v. Ginsburg*, 785 A.2d 660, 662 (D.C.2001) (citation omitted) (concluding applying the best evidence rule that the authorization and terms of an order for substituted service could be most reliably confirmed by a copy of the order itself rather than a party's representation that the order was issued). Dr. Wallace failed to challenge the sufficiency of the affidavits on the basis of the best evidence rule. Essentially, she allowed the trial court to consider them, apparently accepting their accuracy and asserting that the number of documents reviewed was not a meaningful measure of her productivity. Therefore, the trial court had no occasion to reject the affidavits as inadmissible evidence under the best evidence rule. Objections to inadmissible documents must be made timely, or they will be deemed waived and may be considered by the court. *Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33, 38 n. 10 (D.C.Cir.1987).

**6.** Eckert Seamans' evidence showed that Dr. Wallace's work consisted of reviewing documents in German and other foreign languages and coding them using a certain system so that they could be categorized for identification and production in products liability cases. Dr. Wallace further described the work as reviewing each document for the names of lawyers, special medical procedures, new product inventions, important persons mentioned in the document, confidential and irrelevant information for redaction, and correcting errors made by the "English team."

**7.** On appeal, Dr. Wallace argues that Eckert Seamans engaged in an "ongoing and continuous pattern of legal and ethical violations."

Specifically, she asserts that: (1) a D.C. team leader falsely held herself out as a lawyer and reviewed the work of attorneys; (2) the firm hired certain attorneys before they became members of the D.C. Bar, who failed to seek admission in the time required by the rule; and (3) she alerted the firm that its intention to delay payment to project attorneys would violate local law. However, Dr. Wallace asserted no theory of liability based on these assertions in her complaint, opposition to motion for summary judgment nor even on appeal. She has failed to show any nexus between these assertions and her causes of action and no basis for reversal of the trial court's judgment by reason of these alleged facts.

Moreover, Dr. Wallace did not proceed on the theory that her employer wrongfully concluded that she was one of the two least productive employees when measured by number of documents reviewed. Therefore, this was not a material issue of fact in dispute for consideration by the trial court on her wrongful discharge claims.

## III. Discrimination Claims

### A. *Disability Claim Under the Human Rights Act*

Dr. Wallace alleged a claim of discrimination based on disability under the D.C. Human Rights Act, D.C.Code §§ 2–1401.01 *et seq.* (Human Rights Act or Act). The basis for this claim was that she had foot surgery on July 2, 2008 which required an extended recovery period and that she was terminated only eight days after the surgery, although she had obtained permission to work from home. She alleged that her discharge was based in whole or in part on her disability in violation of D.C.Code § 2–1402.11(a)(1). Concluding that a temporary disability of the kind asserted here is not one protected under the Human Rights Act, the trial court granted summary judgment for Eckert Seamans on the disability claim. On appeal, Dr. Wallace argues for reversal, contending that the protections under the Act are not limited to permanently disabled individuals and that a contrary reading of the statute defeats its purpose.

■ The section of the Human Rights Act upon which Dr. Wallace relies prohibits an employer from discharging an individual, wholly or partially, based on his or her disability. D.C.Code § 2–1402.11(a)(1). To establish a *prima facie* case of disability discrimination under the Act, a plaintiff must first establish that he or she has a disability for which reasonable accommodation can be made. *Grant v. May Dep't Stores Co.,* 786 A.2d 580, 583 (D.C.2001) (citation omitted). The Act defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual having a record of such an impairment or being regarded as having such an impairment." D.C.Code § 2–1401.02(5A) (2001). In this context, "substantially limits" a major life activity means that the disability significantly restricts the person's " 'ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.' " *Grant,* 786 A.2d at 584 (quoting *Croley v. Republican Nat'l Comm.,* 759 A.2d 682, 700 n. 17 (2000) (quoting 29 C.F.R. § 1630.2(j)(3)(I))). A "major life activity" includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* (citation omitted).

Dr. Wallace argues that her foot surgery limited her ability to walk, drive and care for herself and perform a broad range of jobs, thereby meeting the statutory requirements. However, she concedes that her condition was only temporary, and it was the temporary nature of her condition that resulted in the trial court's dismissal of her claim. In reaching its conclusion, the trial court relied on interpretations of similar provisions of the Americans with Disabilities Act ("ADA") and EEOC regulations. This court has considered decisions under the ADA and EEOC guidelines as persuasive in interpreting comparable provisions of the Human Rights Act. *See Grant, supra,* 786 A.2d at 583 (citing *e.g., Howard Univ. v. Green,* 652 A.2d 41, 45 (D.C.1994); *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 367–68 (D.C.1993); and *Lyles v. District of Columbia Dep't of Emp't Servs.,* 572 A.2d 81, 82–83 (D.C.1990)).

■ The definition of disability under the ADA is virtually identical to the definition of the term under the Human Rights Act.[8] In *Grant*, we recognized specifically that the "definition" of disability in the Human Rights Act is substantially similar to that found in the ADA and EEOC regulations.[9] *Id.* at 583. Under the ADA, as interpreted by EEOC regulations, "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include ... broken limbs...." 29 C.F.R. Ch. XIV, Pt. 1630, App. (7–1–10 ed.)[10] Citing this regulation, the Fifth Circuit upheld the grant of summary judgment on a claim alleging disability discrimination under the ADA based on a temporary and surgically correctable ankle affliction. *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 761 (5th Cir. 1996). In *Rogers*, the court concluded that the physical impairments relied upon were not "either chronic or severe enough to constitute a disability under the ADA." *Id.*

at 759. Similarly, Dr. Wallace's temporary foot impairment, for which she had surgery and a brief recovery period, does not constitute a disability under the Human Rights Act, which has the same definition for disability as the ADA.

Apparently recognizing her inability to make the threshold showing of disability under the interpretation of the term's meaning under the ADA, Dr. Wallace argues that this court should not look to the ADA and federal regulations in interpreting the term. As reasons for this position, she points to two general propositions: (1) this court's recognition that the Human Rights Act is a remedial civil rights statute that must be generously construed;[11] and (2) a legislative amendment emphasizing the Human Rights Act's broad scope.[12] In addition, she cites a case in which this court cautioned that although cases construing Title VII are generally apt in interpreting the Human Rights Act, differences in federal and local law must be borne in mind when interpreting local law.

8. Disability under the Human Rights is defined as

a physical or mental impairment that substantially limits one or more of the major life activities of an individual having a record of such an impairment or being regarded as having such an impairment.

D.C.Code § 2–1401.02(5A). The definition of disability in the ADA is as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment;

(C) or being regarded as having such an impairment.

42 U.S.C. § 12102(1).

9. The EEOC is responsible for enforcement of Title I of the ADA, 42 U.S.C. § 12101 *et seq.* (1990), which prohibits employment discrimination on the basis of disability.

10. The Appendix cited represents the EEOC's interpretation of the issues addressed therein and by which it will be guided when resolving charges of discrimination in employment. 29

C.F.R. XIV, Pt. 1630, App. Introd. (7–1–10 ed.).

11. *See Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 731 (D.C. 2000) (citing *Skadden, Arps, supra*, 715 A.2d at 889 and *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 398 (D.C.1991)).

12. Dr. Wallace cites the District of Columbia Council's Committee Report on *Bill* 12–34, "The Human Rights Act of 1997," at 2 (May 29, 1997). The passage upon which she relies states as follows:

The District's human rights law has long been praised for its broad scope. The law bans discrimination in employment, housing, public accommodations, and education. It protects people from discrimination based on characteristics covered in federal civil rights law ... as well as other characteristics not covered under federal law, such as sexual orientation, marital status, and family responsibilities.

*See Esteños v. PAHO/WHO Fed. Credit Union,* 952 A.2d 878, 886 (D.C.2008). Dr. Wallace argues that applying these general propositions, discrimination based upon a temporary disability is prohibited under the Human Rights Act. The general propositions that Dr. Wallace quotes do not lead to the result that she seeks.

■ In *Esteños,* upon which Dr. Wallace relies, this court held that the Human Rights Act allows an employee to raise a claim of national origin discrimination based on evidence of an English proficiency requirement. *Esteños, supra,* 952 A.2d at 882.[13] While acknowledging certain differences between Title VII and the Human Rights Act, the majority ultimately found support for its decision in EEOC regulations, incorporated into local regulatory law for agencies responsible for implementing the Human Rights Act, and therefore, owed deference in interpreting it. *Id.* at 892 (citing *United States Parole Comm'n v. Noble,* 693 A.2d 1084, 1096–97 (1997) (en banc)). One difference mentioned in the opinion and relied upon by Dr. Wallace here is the Council's expressed intent "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to the enumerated [protected] classes." *Id.* at 887 (quoting D.C.Code § 2–1401.01 (2007 Supp.)). This expressed intention "does not mean, however, that this court will create new protected classes not identified by the legislature." *Id.* (citing *Sorrells v. Garfinckel's, Brooks Bros.,* 565 A.2d 285, 289 (D.C.1989)). Here, the protected category, disability, is defined in the Human Rights Act in a way that does not include every passing physical ailment that an individual might experience. Put another way, this court cannot read into the statute coverage for insubstantial temporary conditions that were not intended by the legislature to be covered.

■ Dr. Wallace has offered no reason to depart from the principle that this court will follow cases construing Title VII "to the extent that the [A]cts use similar words and reflect similar purpose." *Id.* at 886 (citing *Benefits Commc'n Corp. v. Klieforth,* 642 A.2d 1299, 1301 (D.C.1994)) (other citations omitted). The definitions of the term at issue are virtually identical, and the ADA and the Human Rights Act reflect similar purposes. Therefore, the trial court properly relied upon federal case law and EEOC regulations in interpreting the meaning of disability. Under that reasonable interpretation of the term, Dr. Wallace's foot surgery, for which she reported a recovery period of only a few months and the ability to work from home, does not qualify as a disability under the Human Rights Act. Therefore, we find no error in the trial court's ruling dismissing Dr. Wallace's disability discrimination claim.

**B. Race, Age and Sex Discrimination Claims**

■ Dr. Wallace also alleged in her complaint that her employer discriminated against her based upon her "race, color and her status as an African–American," her age (over 50 years), and her gender (female) in violation of D.C.Code § 2–1402.11(a)(1). In pertinent part, this statute prohibits discrimination in employment

---

13. Judge Schwelb agreed with the majority that the claim was not time barred. *Esteños, supra,* 952 A.2d at 896 & 896 n. 1 (Schwelb, J., concurring in part and dissenting in part). However, Judge Schwelb would have affirmed the trial court's grant of summary judgment, concluding that viewing the record in the light most favorable to Esteños, no impartial trier of fact could find that he had been fired because of his national origin. *Id.* at 901.

based on race, color, sex, and age. In considering discrimination claims under the Human Rights Act, this court uses the three-part, burden-shifting test set forth by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Hollins v. Fed. Nat'l Mortg. Ass'n*, 760 A.2d 563, 571 (D.C.2000) (citations omitted). This test requires the employee to establish first a *prima facie* case of discrimination by a preponderance of the evidence, which if made, raises a rebuttable presumption of unlawful discrimination. *Id.* (citing *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 (D.C.1993)) (other citation omitted). Second, once this *prima facie* showing is made, the burden shifts to the employer to rebut the presumption "by articulating 'some legitimate, nondiscriminatory reason for the employment action.'" *Id.* (quoting *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1099 (D.C.1986)). The employer can meet this burden by producing evidence from which the trier of fact can conclude that its action was not motivated by a discriminatory reason. *Id.* (citing *Atlantic Richfield*, 515 A.2d at 1099–1100). Third and finally, the burden shifts back to the employee to prove by a preponderance of the evidence that the employer's stated reason was simply a pretext for an unlawful discriminatory purpose. *Id.* (citing *Arthur Young*, 631 A.2d at 361). The ultimate burden of proving that the employer discriminated intentionally remains with the employee-plaintiff at all times. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

 In order to establish a *prima facie* case of discriminatory discharge under the Human Rights Act, Dr. Wallace was required to show that: (1) she is a member of a protected class; (2) she was qualified for the position from which terminated; (3) she was terminated in spite of her qualifications for the position; and (4) a substantial factor for the termination was that she is a member of the protected class. *Hollins, supra*, 760 A.2d at 572 (citing *McDonnell Douglas Corp., supra*, 411 U.S. at 805, 93 S.Ct. 1817 (other citations omitted)) (setting forth required elements of proof for a claim of discriminatory discharge based on race under the Human Rights Act). In the trial court, the parties did not contest the first three elements of Dr. Wallace's *prima facie* case. Therefore, like the trial court in this case, we assume that they were sufficiently established to move to consideration to the fourth element. *See id.* at 572. The trial court concluded that Dr. Wallace failed to establish the fourth required element because she failed to show that she was treated differently than other similarly situated employees.

 To sustain the burden on the fourth element, Dr. Wallace was required to "show that she was treated differently from [an Eckert Seamans] employee, all of whose relevant employment aspects were 'nearly identical' to hers." *Wallace v. Skadden, Arps, Slate, Meagher & Flom LLP*, 799 A.2d 381, 386 (D.C.2002) (citing *Hollins, supra*, 760 A.2d at 578). We agree with the trial court that Dr. Wallace failed to make that showing. In support of this element, Dr. Wallace offered that she was treated less favorably than younger white attorneys who engaged in misconduct and were less productive. Specifically, she refers to four individuals who the firm allegedly permitted to work while they were not members of the District of Columbia Bar, two of whom failed to apply timely for membership consistent with court rules. What is lacking in her representation is any showing that any of these

employees were retained in spite of shortcomings or transgressions similar to her own (*i.e.,* failure and refusal to meet or attempt to meet the employer's performance level standards). That these employees were not discharged or penalized for reasons unrelated to the facts surrounding Dr. Wallace's discharge is not relevant to her claim of disparate treatment. The evidence shows that all employees in her category were subject to the same productivity standards. Dr. Wallace does contend that the productivity level of two of these employees were the subject of the firm's concern at one point. However, she fails to show that these employees did not meet or work to comply with the employer's new productivity goals. Absent such a showing, Dr. Wallace has failed to meet her burden of showing that she was treated differently than similarly situated employees. Indeed, the fact that the firm sought to discharge Mr. Wilfert, a white male, and Dr. Wallace for low productivity levels and offered each of them continued employment on the same terms, which Dr. Wallace rejected, undercuts her disparate treatment argument.[14]

Although the trial court concluded that Dr. Wallace failed to make a *prima facie* case of discrimination, it addressed her claim that the employer's stated reason for her discharge was pretextual. Once an employer presents a legitimate, non-discriminatory reason for terminating an employee, the burden shifts to the employee to show that the stated reason was a pretext for discrimination. *See Hollins, supra,* 760 A.2d at 573. The trial court held that while the employer had produced more than enough evidence to meet the burden of producing a legitimate explanation, Dr. Wallace failed to produce sufficient evidence to show a jury triable issue.

■ The non-discriminatory reason shown by Eckert Seamans for terminating Dr. Wallace's employment was that her productivity level was materially lower than that of her peers who were foreign language document reviewers.[15] In challenging the employer's non-discriminatory reason, Dr. Wallace contends first that the four affidavits supporting the employer's non-discriminatory reason rely upon reports, logs and data which are inadmissible hearsay. We reject this argument essentially for the reasons stated in Section II. B. First, her objection to the admissibility of this evidence on hearsay grounds, made for the first time on appeal, is deemed waived. *See Catrett, supra,* 826 F.2d at 38 n. 10. Second, the reports, logs and data were not hearsay because they were not offered for the truth of the matter asserted, but rather to show that the employer relied upon this material in making the decision about which employees to terminate. *See Hollins, supra,* 760 A.2d at 573 (holding that reports made by outside

---

14. Dr. Wallace's deposition testimony reveals a lack of evidence supporting her race and age discrimination claims. When asked why she believed that she was terminated because of her race, Dr. Wallace responded,

[b]ecause I'm black. Because I had excellent reviews ... I believe I was doing more languages than other people, though being paid the same amount .... it would seem irrational to terminate such a person, particularly since I was such a good deal. And generally decisions based on race are irrational economically.

When asked why she believed she was discharged because of her age, Dr. Wallace testified in pertinent part:

... a younger person is probably more amenable to the types of instructions that were being given then someone like myself who had just—it would have just been easier. But that's a personal impression.

15. Details concerning the employer's reason are set forth in detail in Section II. B., *supra.*

counsel relied upon in terminating an employee were not hearsay because not offered for their truth, but to show that the employer relied upon them).

■■■■■ Dr. Wallace also argues that the employer's productivity measures are meaningless, arbitrary and false. She contends that the number of documents reviewed per hour is not an appropriate measure of productivity because documents are of different lengths and complexity. Dr. Wallace offered no expert evidence in support of her claim that her employer's productivity measures are unsuitable for setting performance goals for contract attorneys performing foreign language document review or outside of some recognized standard. Such proof is not so obvious as to lie within the ken of the average lay juror, and therefore, expert testimony is required. *See generally Lasley v. Georgetown Univ.*, 688 A.2d 1381, 1385 (D.C.1997). Moreover, the evidence shows that the employer applied the same productivity standard to Dr. Wallace's peers over a two and one-half month period before determining to discharge the slowest performers. There is no showing that in doing so, the employer relied upon improper discriminatory reasons. Again, the fact that the employer reconsidered its discharge decision and offered Dr. Wallace continued employment provided she made a commitment to maintain a higher level of productivity undercuts her claim that the employer was motivated by other improper reasons. She rejected that offer.[16]

Finally, Dr. Wallace argues that she successfully attacked the plausibility of Eckert Seamans' explanation of her low productivity with specific evidence that the firm knew that she was meeting and exceeding all measures of productivity but that it manipulated the measures in order to discharge her. There is no evidentiary basis for this claim in the record.[17] Our review of the record shows that the trial court properly granted summary judgment on Dr. Wallace's age, gender and race discrimination claims.

## IV.

Appellant's remaining arguments can be disposed of briefly.

■■■■■ A. **Promissory Estoppel**—In Count III of her complaint, Dr. Wallace alleged a claim for damages based on promissory estoppel. Specifically, she alleged that Eckert Seamans promised her that she could work from home for two weeks following foot surgery. Further, she alleged that without that promise, which she contends implied a promise of continued employment after working at home, she would not have undergone the surgery and associated expenses at that time. Liability on the theory of promissory estoppel requires "evidence of a promise, the promise must reasonably induce reliance upon it, and the promise must be relied upon to the detriment of the promisee." *Simard v. Resolution Trust Corp.*, 639 A.2d 540, 552 (D.C.1994) (citations omit-

---

16. *See supra* note 5.

17. Dr. Wallace's reliance on the Supreme Court's decision in *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) is misplaced. In *Reeves*, the employer discharged the employee, citing numerous timekeeping errors. In his age discrimination suit, the employee "made a substantial showing that [the employer's explanation] was false," offering evidence that he maintained the time records properly and that the automated time clock often failed to scan timecards so that no time of arrival was recorded. *Id.* at 143, 120 S.Ct. 2097. Here, Dr. Wallace has not provided admissible evidence that her productivity level was up to the level of her peers during the test period nor that the employer manipulated the results of its productivity measures.

ted). There is no dispute that the employer promised Dr. Wallace that she could work from home for two weeks after her surgery. However, there is no evidence that the employer promised her that she could not be discharged from her employment during this period. Her deposition testimony supports the contrary. Further, Dr. Wallace admitted at deposition that she scheduled her foot surgery before becoming aware that she would be permitted to work from home. Thus, the element of reliance is dispelled. There is no evidence that there was any promise to change the at-will status of Dr. Wallace's employment or to waive satisfactory performance during this period. Therefore, we find no error in the trial court's grant of summary judgment to Eckert Seamans on this claim.

**B. *Discovery Issue*—Dr. Wallace** argues that the trial court erred in denying, in part, her motion to compel production of certain documents on the ground of Eckert Seamans' assertion of a work product privilege. Specifically, she refers to (1) documents she contends were produced subsequently to parties opposing Eckert Seamans' client in products liability litigation, and (2) communications between her and the firm's staff regarding her project attorney duties. She argues that documents prepared in anticipation of previous litigation are not covered by work product privilege and that the attorney-client privilege, Rule 1.6 of the District of Columbia Rules of Professional Conduct, cannot be used to prevent discovery.[18]

The Supreme Court has held that the literal language of Rule 26(b)(3) of the Federal Rules of Civil Procedure, which protects an attorney's mental impressions, opinions and theories, "protects materials prepared for *any* litigation or trial as long as they were prepared by or for a party to the subsequent litigation."[19] *Fed. Trade Comm'n v. Grolier, Inc.,* 462 U.S. 19, 25, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983). To attach the temporal limitation to the rule as Dr. Wallace suggests is inconsistent with this precedent and with language of the rule and D.C. Bar Rule X, § 1.6. That Dr. Wallace herself participated in the preparation of some of these documents is irrelevant to Eckert Seamans' assertion of privileges. She is no longer an attorney for the client, and therefore, does not come within the scope of the attorney-client relationship.

This court reviews the trial court's decision on discovery issues for an abuse of discretion. *Futrell v. Dep't of Labor Fed. Credit Union,* 816 A.2d 793, 809 (D.C.2003). The trial court has broad discretion in whether to grant a motion to compel discovery. *Id.* Eckert Seamans produced a detailed privilege log in which they identified the documents withheld and the reasons for assertion of the privilege. The trial court found that Dr. Wallace "has failed to establish, as to any particular document, either that the defendants' assertion of privilege is unjustified or that the privilege [Eckert Seamans] ... asserted should be overcome." On appeal, she

---

**18.** Rule 1.6 of the District of Columbia Rules of Professional Conduct, provides, in pertinent part, as follows:

(a) Except when permitted under paragraph (c), (d), or (e), a lawyer shall not knowingly
(1) reveal a confidence or secret of the lawyer's client;
(2) use a confidence or secret of the lawyer's client to the disadvantage of the client;

(3) use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person.
D.C. Bar R. X, § 1.6(a).

**19.** Super. Ct. Civ. R. 26(b)(3) is virtually identical to the federal rule; therefore, we consider persuasive authorities interpreting the federal rule.

has not done so with respect to any specific request. We find no abuse of discretion in the trial court's ruling.[20]

C. *Law of the Case Argument*—Dr. Wallace argues that the trial court was prohibited by the law of the case doctrine from allowing Eckert Seamans to file its motion for summary judgment. Judge Kravitz, who was assigned to the case before it was reassigned to the Civil I calendar, denied Eckert Seamans' motion for leave to file a motion for summary judgment and motion for reconsideration. Subsequently, the Presiding Judge of the Civil Division entered an order designating the case as a Civil I case, assigned it to Judge Natalia Combs Greene, ordered that orders previously issued remain in force until amended or vacated by Judge Combs Greene, and required the parties to file a Status Report. In its Status Report and at a subsequent Status Conference, Eckert Seamans, suggested that, in keeping with Super. Ct. Civ. R. 16's purpose of narrowing the issues and conducting an orderly trial, the trial court should revisit the prior decision not to consider Eckert Seamans' motion for summary judgment. The trial court granted the request.

 "The 'law of the case doctrine' bars a trial court from reconsidering the same question of law that was presented to and decided by another court of coordinate jurisdiction when (1) the motion under consideration is substantially similar to the one already raised before, and considered by, the first court; (2) the first court's ruling is 'sufficiently final' and (3) the prior ruling is not 'clearly erroneous in light of newly presented facts or a change in sub-

stantive law.' " *Tompkins v. Washington Hosp. Ctr.*, 433 A.2d 1093, 1098 (D.C.1981) (citations omitted). Here, the record shows that the prior ruling denying Eckert Seamans leave to file the motion was based on its untimeliness, not the merits of the motion. Indeed, the timelines for this case changed once it was assigned to the Civil I calendar and new deadlines were set by the assigned judge. The prior order did not have the type of finality to which the law of the case doctrine applies. Therefore, we find no error in the trial court's ruling allowing the filing of the motion for summary judgment.

For the foregoing reasons, the judgment of the trial court hereby is affirmed.

*So ordered.*

---

**20.** The trial court denied the motion to compel production of document requests numbered 3, 4, 5, 6, 8 and 9. Requests 3, 4, and 5 were documents prepared, edited, reviewed and coded by Dr. Wallace while working for the firm. Request 6 related to documents in Dr. Wallace's computer files at the firm. Re-

quest 8 related to manuals, guidelines or instructions, and Request 9 related to correspondence with any of the foreign language attorneys. Eckert Seamans asserted both the attorney-client privilege and work product privilege as to each of these requests.